

REDACTED FOR PUBLIC DISCLOSURE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-16-01300-PHX-DLR(MHB) |
|---|---|
| Plaintiff, | **INDICTMENT** |
| vs. | VIO: 18 U.S.C. § 1343<br>(Wire Fraud)<br>Counts 1-20 |
| Michael Sean Graham, | |
| Defendant. | 18 U.S.C. § 1341<br>(Mail Fraud)<br>Counts 21-24 |
| | 18 U.S.C. § 981(a)(1)(C) and<br>28 U.S.C. § 2461(c)<br>(Forfeiture Allegations) |

THE GRAND JURY CHARGES:

At all times material to this indictment, within the District of Arizona and elsewhere:

**INTRODUCTION**

1. Defendant MICHAEL SEAN GRAHAM ("GRAHAM") was the manager of Strat X, LLC ("Strat X"), a foreign corporation registered in the Republic of Seychelles, an island nation located in the Indian Ocean.

2. Strat X was registered with the State of Arizona as a foreign entity. On July 12, 2013, Strat X was incorporated. On that same date, GRAHAM was appointed the statutory agent for Strat X.

## DEFENDANT'S CRIMINAL SCHEME

### Overview

3. GRAHAM claimed to be the owner of a computer software program capable of earning consistent returns by trading in the foreign exchange ("FOREX") market. Investors in GRAHAM's company, Strat X, were promised huge returns on their investments through trades made by GRAHAM's software program on the foreign exchange market. Over the course of two years, GRAHAM obtained over $2 million from investors. GRAHAM controlled all bank accounts that held the investors' money. At the beginning of the scheme, when investors requested payouts from their investment "earnings," GRAHAM would often send them some money, though that money was not investment earnings, but other investors' deposits. Towards the end of the scheme, however, whenever investors requested money GRAHAM gave excuses as to why he could not repay them. In reality, GRAHAM only invested a small portion of the investors' funds in the FOREX market. GRAHAM used the vast majority of the funds to either (a) repay earlier investors, or (b) enrich himself.

### Foreign Exchange Market

4. The FOREX market is a global market for the trading of currencies. This market includes all aspects of buying, selling, and exchanging currencies. It is the largest market in the world in terms of volume of trading. The average trading volume exceeds $5 trillion. The FOREX market is largely an over-the-counter market, meaning trading occurs on electronic platforms and via telephone between banks and other market participants. Participants in the market include large banks, multinational corporations, governments, and speculators. The FOREX market operates 24 hours a day Monday-Friday.

5. The FOREX market does not determine relative values of currencies, but sets the current market price of the value of one currency as demanded against another. All FOREX trades involve two currencies because the trader is betting on the value of one

currency against another. There is little supervisory oversight in regulating the trades, due to the nature of trading two different foreign currencies.

### Strat X's Ponzi Scheme

6. A "Ponzi scheme" is a particular type of financial fraud, in which an investment operation claims to pay returns to customers based on some promised investment strategy. In fact, in a Ponzi scheme, the perpetrator does not invest his client's money as promised; instead, one investor is paid from money "invested" by another.

7. GRAHAM's company Strat X, purported to own proprietary software and "algorithms" designed to hedge foreign currency transactions in the FOREX market. To induce people to invest money with Strat X, GRAHAM often represented that his software would provide a 48%-50% return on investment. GRAHAM also represented certain security features that his company provided, including: (a) "only utilizing up to ten percent of the account's value for open position required margin"; (b) maintaining sub-accounts for each investor and avowing that "[a]ll client funds remain in the separate accounts according to their initial set-up"; and (c) that Strat X's trading is "fully transparent" and the investors' "accounts and trading positions can be monitored or audited at all times."

8. In reality, Strat X was a Ponzi scheme. Instead of using the investors' money to make trades on the FOREX market, GRAHAM diverted the vast majority of investor money either for his own personal use or to pay back other investors. If GRAHAM deposited any of the investors' money into FOREX trading accounts, it was a negligible amount.

9. In order to continue the fraud, GRAHAM created and distributed bogus monthly account statements to the Strat X investors, which purported to show that their money had been invested, when in fact the statements had no basis in reality. These false monthly account statements were the result of GRAHAM's use of a simulator that appeared to be making trades on the FOREX market, even though very little, if any, of the investors' money was being traded on the FOREX market. The fraudulent account statements led

- 3 -

investors to believe that GRAHAM was actually making trades on their behalf, resulting in large profits.

10. Between 2013 and 2015, Strat X received $2,135,770.13 from investors who gave money under the belief GRAHAM would use his software and trading algorithm to make money trading in the FOREX market. From this amount of money, GRAHAM paid $393,224.99 back to investors. The remaining $1,742,545.14 GRAHAM diverted for other uses, including personal expenditures.

## The Victims

### S.G.

11. In or around 2014, S.G. met GRAHAM. When the two met to discuss the potential for S.G. investing in Strat X, GRAHAM showed S.G. a chart that showed how a $250,000 investment could result in a balance of $3,000,000 in seven years. GRAHAM represented that this type of growth was typical for Strat X investors—a rate of return of around 48%.

12. In March 2014, S.G. invested $10,000 with GRAHAM's company. After S.G. invested the money, GRAHAM began to email S.G. fraudulent periodic statements that purported to show the balance of S.G.'s trading account. According to the account statements sent by GRAHAM, S.G.'s $10,000 investment had increased in value.

13. In September 2014, S.G. decided to invest another $100,000.

14. GRAHAM spent S.G.'s $100,000 in the following manner: (a) $45,000 was wired to GRAHAM's wife; (b) $23,000 was paid to an earlier investor; (c) $4,540 wired to an investment account in Poland; and (d) the remainder GRAHAM withdrew in cash, or used for his personal or business expenses. By December 1, 2014, the $100,000 GRAHAM received from S.G. had been fully liquidated.

15. On December 6, 2014, GRAHAM responded to an email inquiry from S.G. and affirmed that the account statements sent from GRAHAM to S.G. falsely showed that S.G. had $201,595.08 in S.G.'s Strat X trading accounts.

16. In January 2015, S.G. knew he would have a $400,000 tax liability due by April 15, 2015. S.G. spoke with GRAHAM about investing additional funds with Strat X for a three-month time period. GRAHAM misrepresented to S.G. that S.G. could earn $30,000 in three months if S.G. invested $200,000.

17. On January 31, 2015, S.G. wired an additional $200,000 to GRAHAM.

18. In or around March 2015, S.G. asked GRAHAM to send S.G. his $200,000 plus earnings, so S.G. could pay his tax liability. GRAHAM claimed that a trading account had shut down because of issues with the Swiss Franc "decoupling" from the Euro.

19. On April 2, 2015, GRAHAM wired $80,000 to S.G., claiming that it represented all the money remaining from S.G.'s $310,000 investment. At the time, GRAHAM had over $240,000 in a business account and $31,000 in a personal account.

### S.I.

20. S.I. was introduced to GRAHAM through S.I.'s life insurance agent. When she met GRAHAM, S.I. was retired and living on a fixed income.

21. In or around May 2013, S.I. decided to liquidate her retirement accounts and invest her money with GRAHAM. S.I. invested $250,270.13 with Strat X, though she incurred fees of about $6,000 by withdrawing the money and closing her accounts.

22. S.I. spoke to GRAHAM over the phone. S.I. told GRAHAM she did not want to have a large percentage of her principal at risk, so she requested that GRAHAM only make trades with profit earned from the principal whenever possible. GRAHAM represented to S.I. that he would be able to trade primarily with the profit because her investment would double within six to eight months.

23. Initially, GRAHAM sent S.I. money upon request. In total, S.I. received $86,976.00 back from GRAHAM. Unbeknownst to S.I., the money GRAHAM sent to her came directly other Strat X investors, not from an investment account in S.I.'s name.

24. In April 2015, GRAHAM told S.I. that she had $18 remaining in her Strat X account. S.I. did not have any prior knowledge about the poor performance of her

- 5 -

investment. Later that month S.I. received her last check for $2,356.00.

**G.I.**

25. G.I. met GRAHAM through G.I.'s financial advisor J.B.

26. GRAHAM, G.I., and J.B. all discussed G.I. investing in Strat X over the phone and during an in-person meeting. GRAHAM made certain representations to G.I. and J.B. at these meetings, including that J.B. would have access to the software program GRAHAM used to make trades, which would allow J.B. to monitor G.I.'s investment account.

27. GRAHAM also provided documents discussing Strat X's "trading strategy" to G.I. and J.B. In these documents, GRAHAM set-forth certain rules he purportedly followed when making trades on the FOREX market. One of these rules was to "[p]reserve the [a]ssets" by "[n]ever risk[ing] more than 5% of account funds." Another document provided by GRAHAM claimed that "[a]ll client funds remain in the separate accounts according to their initial set-up."

28. In April 2015, G.I., based on GRAHAM's misrepresentations about Strat X, wired $450,000 to GRAHAM. Contrary to GRAHAM's representation, after sending the money, neither G.I. nor J.B. had any access to G.I.'s trading account. When J.B. questioned GRAHAM about the status of G.I.'s $450,000, GRAHAM misrepresented that he was experiencing banking issues and was working on finding a new bank.

29. GRAHAM never deposited G.I.'s $450,000 into a personalized trading account. Instead GRAHAM used G.I.'s money primarily to (a) to enrich himself, and (b) to pay back previous investors.

30. G.I. never received any of his $450,000 investment back from GRAHAM.

**D.H.**

31. D.H. met GRAHAM through a mutual acquaintance.

32. In or about August 2014, D.H. sent GRAHAM $50,000. After 30 days, the fraudulent account statement GRAHAM sent to D.H. showed an increase of $15,000.

33. Based on this substantial rate of return, D.H. decided to invest an additional $100,000 with GRAHAM.

34. GRAHAM never deposited D.H.'s $150,000 into a personalized trading account. Instead GRAHAM used D.H.'s money to (a) to enrich himself, and (b) to pay back previous investors.

35. D.H. never received any of his $150,000 investment back from GRAHAM.

### COUNTS 1-20
### Wire Fraud
### (18 U.S.C. § 1343)

36. The factual allegations set forth in Paragraphs 1-35 are realleged and incorporated herein.

37. From on or about May 2013 to on or about August 2015, defendant GRAHAM devised and intended to devise a scheme to defraud Strat X investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and by the concealment and omission of material facts.

38. On or about each of the dates set forth below, in the District of Arizona and elsewhere, GRAHAM, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce certain writings, pictures, signals, and sounds related to Strat X and the investors who paid money to GRAHAM to permit him to make trades on the FOREX market, with each transmission constituting a separate count:

| Count | Wire Date | Sender | Recipient | Money Sent |
|---|---|---|---|---|
| 1 | 01/30/2014 | GRAHAM (Arizona) | D.Ho. (Iowa) | $2,000 |
| 2 | 10/03/2014 | GRAHAM (California) | C.V. (Arizona) | $30,000 |
| 3 | 10/03/2014 | GRAHAM (California) | T.G. (Arizona) | $27,000 |
| 4 | 11/03/2014 | GRAHAM (California) | T.G. (Arizona) | $5,000 |

| | | | | |
|---|---|---|---|---|
| 5 | 11/03/2014 | GRAHAM (California) | C.C. (Arizona) | $20,000 |
| 6 | 11/24/2014 | GRAHAM (California) | C.V. (Arizona) | $25,000 |
| 7 | 12/02/2014 | I.L. (Arizona) | GRAHAM (California) | $10,000 |
| 8 | 12/08/2014 | I.L. (Arizona) | GRAHAM (California) | $90,000 |
| 9 | 12/12/2014 | GRAHAM (California) | C.C. (Arizona) | $25,000 |
| 10 | 12/23/2014 | GRAHAM (California) | C.C. (Arizona) | $10,000 |
| 11 | 12/30/2014 | GRAHAM (California) | T.G. (Arizona) | $4,000 |
| 12 | 02/02/2015 | S.G. (Arizona) | GRAHAM (California) | $200,000 |
| 13 | 02/06/2015 | H.A. (Arizona) | GRAHAM (California) | $30,000 |
| 14 | 02/09/2015 | GRAHAM (California) | C.C. (Arizona) | $12,000 |
| 15 | 02/12/2015 | GRAHAM (California) | C.C. (Arizona) | $38,000 |
| 16 | 02/19/2015 | H.A. (Arizona) | GRAHAM (California) | $25,000 |
| 17 | 03/05/2015 | GRAHAM (California) | H.A. (Arizona) | $23,489.24 |
| 18 | 03/16/2015 | GRAHAM (California) | C.C. (Arizona) | $25,000 |
| 19 | 06/15/2015 | GRAHAM (California) | C.C. (Arizona) | $5,000 |
| 20 | 07/13/2015 | GRAHAM (California) | C.C. (Arizona) | $4,000 |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS 21-24
## Mail Fraud
## (18 U.S.C. § 1341)

39. The factual allegations set forth in Paragraphs 1-35 are realleged and incorporated herein.

40. From on or about May 2013 to on or about August 2015, defendant GRAHAM devised and intended to devise a scheme to defraud Strat X investors and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises and by the concealment and omission of material facts.

41. On or about each of the dates set forth below, in the District of Arizona and elsewhere, GRAHAM, for the purpose of executing the scheme described above, caused the following items to be placed in an authorized depository for mail to be sent and delivered by the U.S. Postal Service, or caused the following items to be deposited and sent or delivered by a private or commercial carrier, with each transmission constituting a separate count:

| Count | Date | Sender | Recipient | Items Sent |
|---|---|---|---|---|
| 21 | 05/11/2013 | S.I. | GRAHAM | 3 checks for $250,207.13 |
| 22 | 03/24/2014 | S.G. | GRAHAM | 1 check for $10,000 |
| 23 | 05/01/2014 | GRAHAM | S.I. | 1 check for $2,000 |
| 24 | 09/20/2014 | S.G. | GRAHAM | 1 check for $100,000 |

All in violation of Title 18, United States Code, Section 1341.

### FORFEITURE ALLEGATIONS

42. Upon conviction of the offenses set forth in Counts 1-24 of this Indictment, GRAHAM shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, tangible or intangible, which is obtained, directly or indirectly, as a result of such offense. The property to be forfeited includes, but is not limited to, the following:

(1) A sum of money equal to at least $2,135,770.13 in United States currency, representing the amount of money involved in the offenses.

(2) The real property at 26313 S. 198th Way, Queen Creek, Arizona 85142, and more specifically described on land the East half of the South 264.00 feet of the East half of the Southwest quarter of the Northeast quarter of the

Southeast quarter of Section 32, Township 2 South, Range 7 East of the Gila and Salt River Base Meridian, Maricopa County, Arizona, according to records of Maricopa County, Arizona, APN 304-90-055K, together with all appliances, fixtures, and attachments thereto.

43. If any of the property described above, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All in accordance with Title 18, United States Code, Section 981 and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

*S/*

FOREPERSON OF THE GRAND JURY
Date: October 25, 2016

JOHN S. LEONARDO
United States Attorney
District of Arizona

*S/*

ANDREW C. STONE
Assistant U.S. Attorney